FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 0 5 2019 ★

BROOKLYN OFFICE

WK:KTF
F. #2016R01805

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

JEFFREY CHARTIER,
STEPHANIE LEE,
LAWRENCE ISEN and
MICHAEL WATTS,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G  I N D I C T M E N T

Cr. No. 17-372 (S-2) (JS)

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1),
982(b)(1), 1349, 1512(c)(2), 1956(h),
1957(a), 1957(b), 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    The Corrupt Boiler Room and Related Entities

1.    My Street Research was a purported financial services business headquartered in Melville, New York that promoted the stocks of publicly traded companies to individual investors, primarily through cold-call campaigns and the circulation of a newsletter. My Street Research was founded under the name Dacona Financial and thereafter changed its name to Power Traders Press ("PTP"), then to Trade Masters Pro and, most recently, to My Street Research. Dacona Financial, PTP, Trade Masters Pro and My Street Research (collectively, the "Boiler Room") all operated from the same office in Melville, New York, and kept substantially the same management despite the changes in the Boiler Room's name. The Boiler Room had various bank and brokerage accounts in its name, including, inter alia, brokerage accounts in the name of PTP (the "PTP Brokerage Accounts"). The Boiler Room

maintained an Internet presence with more than one website from approximately August 2014 through July 2017.  One or more of these websites marketed the Boiler Room as an "unbiased stock research firm" that provided "top notch, detailed, unbiased research."

2.      Elite Stock Research ("ESR") was a purported financial services business headquartered in Plainview, New York that promoted the stocks of publicly traded companies to individual investors, primarily through cold-call campaigns and the circulation of a newsletter from approximately August 2013 through November 2015.  Certain individuals who worked at ESR subsequently worked at the Boiler Room, and ESR promoted some of the same publicly traded companies' stocks that the Boiler Room subsequently promoted.  ESR had brokerage accounts in its name (the "ESR Brokerage Accounts").

3.      National Waste Management Holdings, Inc. ("NWMH") was a publicly traded solid-waste management company with its principal place of business in Hernando, Florida.

4.      CES Synergies, Inc. ("CESX") was a publicly traded asbestos abatement and demolition company with its principal place of business in Crystal Springs, Florida.  CESX operated through its subsidiary Cross Environmental Services, Inc.

5.      Hydrocarb Energy Corporation ("HECC") was a publicly traded petroleum exploration and production company with its principal place of business in Houston, Texas.  On or about April 16, 2016, HECC filed for bankruptcy.

6.      Intelligent Content Enterprises, Inc. ("ICEIF") was a publicly traded company with its principal place of business in Toronto, Canada, which purported to operate an expanding portfolio of websites through its subsidiary, Digital Widget Factory, Inc.

7.     Strategic Capital Markets ("SCM") was a purported investor relations and marketing firm with its principal place of business in Tampa, Florida.  SCM was engaged by CESX and NWMH as their investor relations firm from approximately 2013 until June 2015. SCM had a brokerage account in its name as of approximately December 2013 (the "SCM Brokerage Account").

8.     Type A Partners, Inc. ("Type A Partners") was a purported investor relations and marketing firm with its principal place of business in St. Petersburg, Florida.  Type A Partners had brokerage accounts in its name as of approximately January 2014 (the "Type A Partners Brokerage Accounts").

9.     Marketbyte, LLC ("Marketbyte") was a purported investor relations and marketing firm with its principal place of business in San Diego, California.

10.     Geoserve Marketing LLP ("Geoserve") was a purported marketing firm with its principal place of business in Sugar Land, Texas.

11.     Snap or Tap Productions LLC ("Snap or Tap Productions") was an entity with its principal place of business in Tarzana, California.

II.     Relevant Regulatory Principles and Definitions

12.     A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

13.     The Financial Industry Regulatory Authority ("FINRA") was a not-for-profit organization authorized by Congress to regulate the broker-dealer industry.  Among other things, FINRA administered licensing and examinations for broker-dealers, including the Series

3

7 exam, also known as the General Securities Representative Qualification Examination, and the Series 63 exam, also known as the Uniform Securities State Law Examination.

14.     The term "beneficial owner" was defined under the rules of the United States Securities and Exchange Commission ("SEC").  It included any person who directly or indirectly shared voting power or investment power (i.e., the power to sell a security).

15.     A "public company" was a company that issued securities and traded its stock on a stock exchange or over-the-counter market.  The company's shareholders were the equity owners of the company.  Daily trading in the market determined the value of the company.

16.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies that have a low market capitalization.  Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges.  Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

17.     "Over-the-counter" ("OTC") referred to how securities of public companies that were not listed on a centralized exchange, such as the New York Stock Exchange or NASDAQ, were traded.  OTC trades occurred over a broker-dealer network.  Penny stocks were typically traded OTC.

18.     A stock manipulation scheme was a scheme in which a group of individuals who controlled large numbers of allegedly unrestricted shares of a microcap company fraudulently inflated the share price and trading volume of the targeted public company through, inter alia, wash and matched trades, press releases and paid stock promotions.  When

4

the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

19.     Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B.  Matched trades were similar to wash trades but involved a related third person or party who placed one side of the trade.  For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker.  Both wash trades and matched trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

20.     A limit order was a direction given to a bank or broker to buy or sell a security or commodity at a specified price or better during a specified time period.

21.     A small lot transaction was a purchase or sale of a security in a small quantity.

III.    The Defendants and Relevant Co-Conspirators

22.     The defendant JEFFREY CHARTIER was the President of NWMH and a member of the boards of directors of both NWMH and CESX.  CHARTIER and the defendant STEPHANIE LEE together incorporated SCM.  CHARTIER was a co-signatory on the SCM Brokerage Account, which account he and LEE opened together in or about December 2013.

CHARTIER also was a co-signatory, together with LEE, on more than one of SCM's bank accounts.  CHARTIER was also formerly a registered broker-dealer with FINRA.

23.     The defendant STEPHANIE LEE was an owner and principal of SCM and Type A Partners.  LEE incorporated Type A Partners in approximately September 2013.  LEE was the sole signatory on the Type A Partners Brokerage Accounts and on Type A Partners bank accounts.  LEE was a co-signatory, together with the defendant JEFFREY CHARTIER, on the SCM Brokerage Account and on SCM bank accounts.  LEE was identified as the investor contact for CESX and NWMH.  LEE was also formerly a registered broker-dealer with FINRA.

24.     The defendant LAWRENCE ISEN was a professional marketer and controlled Marketbyte.  ISEN was also formerly a registered broker-dealer with FINRA, but was barred from working in the broker-dealer industry in or about 1995.

25.     The defendant MICHAEL WATTS was a professional marketer and controlled Geoserve.  WATTS's brother was the Chief Executive Officer of HECC.  WATTS was also formerly a registered broker-dealer with FINRA.

26.     Robert Gleckman was formerly a registered broker-dealer with FINRA, and controlled Snap or Tap Productions.

27.     Erik Matz worked in a management role at the Boiler Room.  He was formerly a registered broker-dealer, but was barred from working in the broker-dealer industry in or about 2007.  Matz used accounts in his relatives' names ("Matz Relative 1" and "Matz Relative 2"), individuals whose identities are known to the Grand Jury, and along with another Boiler Room manager, Ronald Hardy, used accounts in the name of another individual ("Individual 1"), an individual whose identity is known to the Grand Jury, to further the fraudulent stock manipulation schemes set forth below.  These included two brokerage accounts

in Matz Relative 1's name (the "Matz Relative 1 Brokerage Accounts") and two brokerage accounts in Individual 1's name (the "Individual 1 Brokerage Accounts"). Matz and Hardy are referred to collectively as the "Boiler Room Managers."

28.     Anthony Vassallo incorporated and controlled ESR. Vassallo was a co-signatory on two brokerage accounts in the name of ESR. Vassallo also received payments from the Boiler Room. Vassallo was also formerly a registered broker-dealer with FINRA, but was barred from working in the broker-dealer industry in or about 1995.

29.     Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was an attorney residing and practicing in Canada who facilitated trading in ICEIF stock.

30.     Co-Conspirator 2, an individual whose identity is known to the Grand Jury, controlled a Bahamian company that traded in ICEIF stock, the identity of which is known to the Grand Jury.

IV.     The Fraudulent Schemes

31.     In or about and between August 2013 and July 2017, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS, together with others, engaged in schemes to defraud investors and potential investors in, among others, one or more of the following publicly traded companies: NWMH, CESX, HECC and ICEIF (collectively, the "Manipulated Public Companies"), by artificially controlling the price and volume of traded shares in the Manipulated Public Companies through, inter alia: (a) artificially generating price movements and trading volume in the shares; and (b) material misrepresentations and omissions in their communications with victim investors about the stock of the Manipulated Public Companies, relating to, among other things, the advisability of purchasing such stock. To execute these schemes, the defendants, inter alia, fraudulently

concealed their control of shares of the Manipulated Public Companies that were held in

brokerage accounts in the names of other individuals or entities. In addition, the defendants lied

to the directors, officers and other shareholders of the Manipulated Public Companies regarding

whether and when they were trading the Manipulated Public Companies' stock, and failed to

disclose that they were engaging in manipulative trading of the Manipulated Public Companies'

stock. In addition, in or about and between 2014 and 2017, CHARTIER, LEE, ISEN and

WATTS, together with others, engaged in a scheme to launder more than $10 million in

proceeds from the foregoing stock manipulation schemes.

     A.    The Stock Manipulation Schemes

        32.    To carry out the fraudulent stock manipulation scheme described below,

the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL

WATTS used their status as insiders at the Manipulated Public Companies to obtain shares in the

Manipulated Public Companies for free or at below-market prices. In turn, the defendants

enlisted the Boiler Room to artificially drive up the share prices of the Manipulated Public

Companies and thereafter sold the defendants' shares to unsuspecting victim investors – many of

them senior citizens – who were persuaded to purchase stock in the Manipulated Public

Companies through the Boiler Room's aggressive cold-calling campaigns. To compensate the

Boiler Room and to facilitate the stock manipulation, the defendants provided the Boiler Room

with shares from the Manipulated Public Companies for free or at below-market prices through

stock purchase and consulting agreements, which shares the Boiler Room also sold at a profit to

unsuspecting victim investors. The defendants did not disclose to the directors, officers or other

shareholders of the Manipulated Public Companies that they had enlisted the Boiler Room to

manipulate the Manipulated Public Companies' stock prices, or that they were using the Boiler Room to unload their own shares at a profit.

33.     Once shares in the Manipulated Public Companies were transferred to the Boiler Room Managers, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS, together with the Boiler Room Managers, engaged in manipulative trading patterns, including wash trades and matched trades, to drive up the price of the shares, while account executives at the Boiler Room (the "Account Executives") (collectively, with the Boiler Room Managers, the "Boiler Room Co-Conspirators"), aggressively and repeatedly called and emailed victim investors to purchase shares in the Manipulated Public Companies.  When victim investors indicated a willingness to purchase a recommended stock, the Account Executives called the victim investors repeatedly, pressured them to follow through with their purchases and directed them to log into their trading accounts while still on the telephone to place purchase orders for the relevant stock.  Many of the victim investors ultimately purchased stock in more than one of the Manipulated Public Companies.  In some cases, the Boiler Room also charged the victim investors for "subscriptions" to receive stock recommendations.

34.     The defendants and their co-conspirators did not disclose to the victim investors that the defendants, their co-conspirators and others were artificially generating share price movements and trading volume and that, at the same time or shortly after the Account Executives recommended the stocks of the Manipulated Public Companies to the victim investors, the defendants sold their own shares in the same companies.  The victim investors therefore were left with the false and misleading impression that the stocks of the Manipulated

9

Public Companies were sound investments in which the Account Executives themselves firmly believed.

35.     The Account Executives' deceptive practices included using false names instead of their true identities during communications with victim investors.  In addition, the Boiler Room Managers traded in shares of the Manipulated Public Companies in brokerage accounts with names that were not associated with themselves or the Boiler Room, including the names of Matz Relative 1 and Individual 1.  Such trading, which included matching trades of both victim investors and co-conspirators as part of the scheme to manipulate the stock of the Manipulated Public Companies, appeared not to be linked to the defendants or the Boiler Room.

36.     The defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS all visited the Boiler Room in person and were aware of its function and capabilities.

37.     In addition to selling their shares to innocent victim investors through the Boiler Room, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS also each individually sold, or recommended the purchase of, stock in the Manipulated Public Companies to victim investors through private placements without disclosing to those victim investors that the stock price was being manipulated.

(i)     The Manipulation of CESX Stock

38.     In or about and between January 2014 and May 2014, the defendants JEFFREY CHARTIER and STEPHANIE LEE, together with Vassallo at ESR and others, engaged in manipulation of the price and trading volume of CESX stock (the "First CESX Manipulation Scheme").  Later, in or about and between June 2015 and August 2015, CHARTIER and LEE, together with the Boiler Room Co-Conspirators, engaged in additional

10

manipulation of the price and trading volume of CESX stock (the "Second CESX Manipulation Scheme"). The defendants also engaged in other manipulative trading to liquidate the CESX stock they owned and controlled throughout 2014 and 2015.

39.     In or about January 2014, the defendant JEFFREY CHARTIER convinced the owner of CESX ("Owner 1"), an individual whose identity is known to the Grand Jury, to hire CHARTIER and CHARTIER's business partner, the defendant STEPHANIE LEE, to make CESX into a public company that issued stock. CHARTIER touted his purported decades of experience working at a major investment firm. CHARTIER and LEE insisted on being paid only in CESX stock, and insisted that CHARTIER serve on CESX's Board of Directors. CESX became a public company in or about March 2014.

40.     The defendants JEFFREY CHARTIER and STEPHANIE LEE obtained CESX shares at no cost as payment for their work towards taking CESX public. Then, together with others, CHARTIER and LEE artificially generated increased trading volume in CESX shares and a spike in CESX's share price during the First CESX Manipulation Scheme and the Second CESX Manipulation Scheme. Vassallo and ESR employees, with respect to the First CESX Manipulation, and the Boiler Room Co-Conspirators, with respect to the Second CESX Manipulation Scheme, convinced victim investors to purchase thousands of CESX shares at inflated prices.

41.     The defendants JEFFREY CHARTIER and STEPHANIE LEE concealed from the directors, officers and shareholders of CESX that they had engaged ESR and the Boiler Room and were manipulating the stock for their own benefit and for the benefit of their co-

conspirators.   Ultimately, CHARTIER and LEE profited from the manipulative trading of CESX

shares when they sold a substantial number of shares at fraudulently inflated prices.

(a)      The First CESX Stock Manipulation Scheme

42.      The First CESX Manipulation Scheme occurred in or about and between

January 2014 and May 2014, and involved concentrated matched trading in CESX shares by the

defendants JEFFREY CHARTIER and STEPHANIE LEE, together with Vassallo at ESR.  As a

result of such matched trading in that time period, the CESX share price increased to a high of

approximately $2.71 per share.

43.      In or about and between January 2014 and March 2014, SCM and Type A

Partners deposited a total of approximately 623,000 shares of CESX into their own brokerage

accounts.

44.      On or about March 25, 2014, the defendant STEPHANIE LEE and

Vassallo executed an agreement in their capacities as Chief Executive Officers of Type A

Partners and ESR, respectively, that provided, in sum and substance, that ESR would raise

investor awareness of CESX and would promote CESX as a recommended stock from April 1,

2014 until May 15, 2014, or until ESR deemed CESX stock no longer beneficial to own,

whichever occurred first.  The agreement also stated that in consideration for the foregoing

services, Type A Partners would deliver to ESR 250,000 shares of CESX, without any restriction

on the transfer of those shares.  Following that agreement, in or about April 2014, ESR deposited

approximately 225,000 CESX shares into the ESR Brokerage Account.

45.      Beginning on or about March 26, 2014 and continuing through

approximately May 2014, victim investors purchased CESX shares while the ESR and Type A

Partners Brokerage Accounts repeatedly sold CESX shares.  Ultimately, the defendants

JEFFREY CHARTIER and STEPHANIE LEE, along with Vassallo and others, profited from the manipulation by selling and directing the sale of CESX shares from the corporate and personal brokerage accounts they controlled.

(b)   The Second CESX Stock Manipulation Scheme

46.   The Second CESX Manipulation Scheme occurred in or about and between June 2015 and October 2015, and involved concentrated matched trading in CESX shares by the defendants JEFFREY CHARTIER and STEPHANIE LEE, together with the Boiler Room Co-Conspirators.  As a result of such matched trading in that time period, the CESX share price increased to a high of approximately $1.01 per share.

47.   In or about June 2015, the defendant STEPHANIE LEE deposited 650,000 CESX shares into one of the Type A Partners Brokerage Accounts.  In or about August 2015, LEE transferred approximately 150,000 of those shares to one of the Matz Relative 1 Brokerage Accounts.  On or about August 24, 2015, CESX issued a press release announcing new business that had been obtained by CESX.

48.   Two days later, on or about August 26, 2015, Type A Partners wired approximately $15,000 to a PTP bank account and approximately $29,000 to a bank account in the name of Matz Relative 1.  The same day, a landline telephone number registered to the Boiler Room made telephone calls to victim investors that coincided with or closely preceded the victim investors' placement of purchase orders in CESX stock.  For example, the telephone number called two different victim investors ("Investor 1" and "Investor 2," respectively), individuals whose identities are known to the Grand Jury, in separate calls.  Just minutes after those calls, Investor 1 purchased approximately 60,000 CESX shares at a price of between approximately $0.84 and $0.85 per share, and Investor 2 purchased approximately 30,000 CESX shares at a

13

price of approximately $0.83 per share. Additionally, on or about August 26, 2015, approximately 269,000 CESX shares were purchased by victim investors who were in contact with the Boiler Room, and approximately 267,000 CESX shares were sold from accounts held in the names of the defendant STEPHANIE LEE, Type A Partners, PTP and others affiliated with the Boiler Room.

49.     Also on the same day, a telephone registered to the defendant STEPHANIE LEE was in contact with a telephone number registered to the defendant JEFFREY CHARTIER at approximately 9:00 a.m. and again at approximately 5:00 p.m. Between those hours, LEE's cellular telephone (the "LEE Telephone") was in contact with a landline telephone number registered to the Boiler Room on three occasions, a cellular telephone number registered to Matz (the "Matz Telephone") on three occasions and a telephone number registered to LEE's stock broker, an individual whose identity is known to the Grand Jury, on three occasions.

50.     From approximately August 25, 2015 to August 26, 2015, CESX daily trading volume increased dramatically from approximately 796 shares to approximately 383,977 shares.

51.     As a result of the First CESX Manipulation Scheme and the Second CESX Manipulation Scheme, the defendants JEFFREY CHARTIER and STEPHANIE LEE made substantial gross trading profits in personal and corporate brokerage accounts they controlled, including approximately $1,014,765 in Type A Partners Brokerage Accounts, approximately $386,765 in the SCM Brokerage Account, approximately $35,089 in LEE's personal brokerage accounts and approximately $494,406 in ESR Brokerage Accounts.

(ii)    The Manipulation of NWMH Stock

52.    In or about and between January 2014 and February 2016, the defendants JEFFREY CHARTIER and STEPHANIE LEE, together with others, engaged in a manipulation scheme relating to NWMH stock.

53.    In or about January 2014, the defendant JEFFREY CHARTIER convinced the owner of NWMH ("Owner 2"), an individual whose identity is known to the Grand Jury, to hire CHARTIER and the defendant STEPHANIE LEE to make NWMH into a public company that issued stock. As with Owner 1 at CESX, CHARTIER touted his purported decades of experience working at a major investment firm. CHARTIER and LEE insisted on being paid only in NWMH stock, and insisted that CHARTIER serve on NWMH's Board of Directors and be named President of the company. NWMH became a public company in or about October 2014.

54.    The defendants JEFFREY CHARTIER and STEPHANIE LEE obtained NWMH shares at no cost as payment for their work towards taking NWMH public, and then, along with the Boiler Room Co-Conspirators, artificially increased NWMH trading volume and price. The Boiler Room Co-Conspirators convinced victim investors to purchase thousands of NWMH shares at inflated prices. CHARTIER and LEE concealed from the directors, officers and shareholders of NWMH that they had engaged the Boiler Room and were manipulating the stock for their own benefit and for the benefit of their co-conspirators. Ultimately, CHARTIER and LEE profited from the manipulative trading of NWMH shares when they sold a substantial number of shares at fraudulently inflated prices.

55.    The NWMH stock manipulation scheme involved periods of concentrated matched trading of NWMH shares by the defendants JEFFREY CHARTIER and STEPHANIE

15

LEE, together with others.  For example, in or about and between February 2015 and May 2015, LEE and Matz executed trades of a large number of NWMH shares using the Matz Relative 1 Brokerage Accounts and the Type A Partners Brokerage Accounts.  As a result of such matched trading in that time period, the NWMH share price increased from approximately $1.00 to $1.98 per share.

56.     The defendants JEFFREY CHARTIER and STEPHANIE LEE, together with the Boiler Room Managers and others, caused the Matz Relative 1 Brokerage Accounts to purchase and sell shares of NWMH almost daily in or about and between February 2015 and May 2015, in multiple small lot transactions using limit orders and matched and wash trades. The brokerage accounts on the other sides of the foregoing matched trades were generally in the names of victim investors whose trades the Boiler Room Co-Conspirators induced and directed, and in the names of co-conspirators and Individual 1.  For example, on or about March 23, 2015, a matched trade of NWMH was executed using brokerage accounts of Matz Relative 1 and Individual 1.  At approximately 2:15 p.m. that day, one of the Matz Relative 1 Brokerage Accounts sold approximately 4,500 NWMH shares at a price of approximately $1.62 per share and one of the Individual 1 Brokerage Accounts purchased approximately 4,500 NWMH shares at the same price.

57.     The defendants JEFFREY CHARTIER and STEPHANIE LEE, together with the Boiler Room Co-Conspirators and others, also used a cold-call campaign to fraudulently increase the price of NWMH stock.  For example, using more than one landline telephone number registered to the Boiler Room, the Boiler Room Co-Conspirators called at least two different victim investors on or about March 25, 2015 ("Investor 3" and "Investor 4," respectively), individuals whose identities are known to the Grand Jury, and minutes later,

Investor 3 and Investor 4 each purchased thousands of shares of NWMH at prices between approximately $1.64 and $1.67 per share. The same day, the defendants and their co-conspirators caused brokerage accounts in the names of Type A Partners and the Boiler Room to sell tens of thousands of NWMH shares.

58.     Later that year, in or about and between October 2015 and December 2015, the defendants JEFFREY CHARTIER and STEPHANIE LEE, together with the Boiler Room Co-Conspirators and others, repeated their pattern of concentrated matched trading in NWMH shares. After CHARTIER, LEE and the Boiler Room Co-Conspirators sold a substantial number of the NWMH shares they controlled, the NWMH share price fell to approximately $0.26 per share by in or about February 2016.

59.     Prior to the foregoing period of matched trading, on or about September 21, 2015, SCM entered into an agreement with the Boiler Room (then operating as PTP), for the sale of 100,000 NWMH shares. The defendant STEPHANIE LEE signed the agreement on behalf of SCM, the seller in the transaction. What purported to be Matz Relative 2's signature was affixed to the agreement on behalf of the Boiler Room, the purchaser of the NWMH shares.

60.     On or about October 1, 2015, SCM wired approximately $10,000 to NWMH's investor relations firm ("Investor Relations Firm 1"), an entity the identity of which is known to the Grand Jury. On or about November 16, 2015, NWMH issued a press release announcing its third quarter financial results and providing an update on its business. That same day, a landline telephone number registered to the Boiler Room called a victim investor ("Investor 5"), an individual whose identity is known to the Grand Jury. Nearly contemporaneously, Investor 5 purchased approximately 21,500 NWMH shares at a price of approximately $1.24 per share. Within an hour of that transaction, the Boiler Room Co-

Conspirators caused brokerage accounts of Matz Relative 1 and Individual 1 to execute a matched trade in which the Individual 1 brokerage account purchased approximately 2,900 NWMH shares at a price of approximately $1.27 per share, and a Matz Relative 1 Brokerage Account sold the same number of NWMH shares at the same price. Later that day, a PTP brokerage account sold approximately 100,000 NWMH shares at a price of approximately $1.26 per share.

61.    The defendants JEFFREY CHARTIER and STEPHANIE LEE were in frequent telephone contact with each other and with the Boiler Room Managers at or near the times of the execution of matched trades connected to the manipulation of NWMH's stock. For example, on or about October 16, 2015, a victim investor ("Investor 6"), an individual whose identity is known to the Grand Jury, purchased approximately 5,000 NMWH shares and, approximately one minute later, the SCM Brokerage Account sold approximately 5,000 NMWH shares. Within approximately one hour before that trade was executed, the Matz Telephone received approximately four text messages from the LEE Telephone. Approximately two minutes after the trade, the Matz Telephone received another text message from the LEE Telephone, and later that day, the Matz Telephone received a total of approximately five additional text messages from the LEE Telephone.

62.    In addition, on or about October 20, 2015, a victim investor ("Investor 7"), an individual whose identity is known to the Grand Jury, purchased approximately 4,600 NWMH shares. The SCM Brokerage Account sold approximately 4,600 NWMH shares within a minute. Within the approximately two hours preceding those trades, the Matz Telephone sent a total of four text messages to the LEE Telephone and received two text messages from the LEE Telephone.

63.     Further, on or about December 10, 2015, the defendants JEFFREY

CHARTIER and STEPHANIE LEE, together with the Boiler Room Managers and others,

executed approximately five matched trades in NWMH stock, all with the same seller.  The

purchaser in each of those trades was either a Matz Relative 1 Brokerage Account or a Type A

Partners Brokerage Account.  Also on or about December 10, 2015, the Matz Telephone and the

LEE Telephone exchanged a total of seven text messages within an approximately three-minute

period, just minutes before the string of matched trades was executed.

64.     As a result of the NWMH stock manipulation scheme, the defendants

JEFFREY CHARTIER and STEPHANIE LEE made substantial gross trading profits in personal

and corporate brokerage accounts they controlled, including approximately $2,063,217 in the

Type A Partners Brokerage Accounts, approximately $1,099,951 in the SCM Brokerage Account

and approximately $242,788 in CHARTIER's brokerage accounts.

(iii)     The Manipulation of HECC Stock

65.     In or about and between August 2014 and January 2016, the defendants

LAWRENCE ISEN and MICHAEL WATTS, together with co-conspirator Robert Gleckman,

the Boiler Room Co-Conspirators and others, engaged in a scheme to manipulate HECC stock.

ISEN and WATTS artificially increased HECC's share price and trading volume, including by

enlisting the Boiler Room to corruptly convince victim investors to purchase thousands of the

shares at inflated prices.  Ultimately, ISEN and WATTS profited from that manipulative trading

of HECC shares when they and their co-conspirators sold a substantial number of shares at the

inflated prices that their fraudulent conduct had generated.

66.     The HECC stock manipulation scheme involved concentrated matched

trading in HECC shares by the defendants LAWRENCE ISEN and MICHAEL WATTS,

19

together with Gleckman, the Boiler Room Co-Conspirators and others, including during the period from approximately November 2015 through January 2016.  As a result of such matched trading in that time period, the HECC share price increased to a high of approximately $2.53 per share.

67.    In or about 2014, approximately one year before the stock manipulation scheme, the Boiler Room acquired HECC shares through Geoserve, controlled by the defendant MICHAEL WATTS, and Snap or Tap Productions, controlled by Gleckman.  In or about and between August 2014 and December 2015, the Boiler Room (then operating as PTP) entered into at least four different purported consulting agreements with Geoserve pursuant to which Geoserve sent the Boiler Room cash and HECC shares.  PTP also purchased HECC shares at a below-market price from Snap or Tap Productions, which had acquired shares directly from HECC.  For example, on or about June 12, 2015, the PTP Brokerage Account purchased approximately 50,000 shares of HECC for approximately $500 from Gleckman.  ISEN, who controlled Marketbyte, facilitated the share transfers between Geoserve, Gleckman and the Boiler Room by, inter alia, providing supporting documentation to a brokerage firm ("Brokerage Firm 1"), an entity the identity of which is known to the Grand Jury, to ensure the successful deposit of HECC shares into a Boiler Room brokerage account.

68.    The defendants LAWRENCE ISEN and MICHAEL WATTS, together with Gleckman, made payments to the Boiler Room prior to, during and after the HECC stock manipulation scheme.  In or about and between August 13, 2015 and October 19, 2015, Gleckman wired approximately $349,500 to a PTP bank account, and in or about and between November 2015 and January 2016, WATTS wired approximately $863,229 from Geoserve to that bank account.

20

69.     Further, in or about and between November 2015 and January 2016, the brokerage accounts of Matz Relative 1 and Individual 1, controlled by the Boiler Room Managers, engaged in matched and wash trades to manipulate HECC's share price. For example, on or about the morning of November 24, 2015, a landline telephone number registered to the Boiler Room called Investor 5. That same morning, brokerage accounts in the names of Matz Relative 1 and Individual 1 purchased thousands of HECC shares and sold thousands of HECC shares for a slightly higher share price. Around the same time, Investor 5 purchased approximately 55,000 HECC shares. HECC's share price increased following such trading. On or about November 25, 2015 and November 27, 2015, the foregoing pattern of communication with Investor 5 and trading in HECC shares was repeated at even higher share prices.

70.     In addition, the defendant MICHAEL WATTS and Marketbyte, controlled by the defendant LAWRENCE ISEN, sold HECC shares directly to victim investors in or about and between July 2015 and January 2016. For example, Marketbyte sold hundreds of HECC shares directly to Investor 1 for $1.30 per share on or about July 21, 2015, and hundreds of HECC shares directly to other victim investors on or about August 6, 2015. Likewise, on October 30, 2015, November 25, 2015, and December 14, 2015, WATTS sold thousands of HECC shares to victim investors. And on or about December 24, 2015 and January 6, 2016, WATTS sold thousands of HECC shares to Investor 5.

71.     As a result of the HECC stock manipulation scheme, the defendants LAWRENCE ISEN and MICHAEL WATTS made substantial gross trading profits in personal and corporate brokerage accounts they controlled, including a total of approximately $884,018 in WATTS's personal brokerage accounts, approximately $100,154 in ISEN's personal brokerage accounts and approximately $283,620 in Marketbyte brokerage accounts.

(iv)     The Manipulation of ICEIF Stock

72.     In or about and between February 2016 and October 2016, the defendant

LAWRENCE ISEN, together with the Boiler Room Co-Conspirators and others, engaged in a

manipulation scheme relating to ICEIF stock.  ISEN artificially generated trading volume in

ICEIF shares and an increased ICEIF share price, including by hiring the Boiler Room to

convince victim investors to purchase thousands of ICEIF shares at inflated prices.  Ultimately,

ISEN profited from that manipulative trading in ICEIF shares when he and his co-conspirators

sold a substantial number of shares at the inflated prices that their fraudulent conduct had

generated.

73.     The ICEIF stock manipulation scheme involved concentrated matched

trading in ICEIF shares by the defendant LAWRENCE ISEN, together with the Boiler Room

Co-Conspirators and others, including during the period from approximately March 2016

through July 2016.  The volume of ICEIF shares trading in approximately March 2016 through

July 2016 was dramatically higher than it had been earlier in 2016.  In addition, approximately

six victim investors purchased a total of approximately 127,000 ICEIF shares on or about and

between March 7, 2016 and March 29, 2016 for approximately $200,000 in total.  As a result of

such matched trading in that time period, the ICEIF share price increased to a high of

approximately $2.29 per share.

74.     On or about March 2, 2016, Co-Conspirator 1 emailed a brokerage firm

("Brokerage Firm 2"), an entity the identity of which is known to the Grand Jury, requesting that

the defendant LAWRENCE ISEN be given trading authority on accounts associated with Co-

Conspirator 1, a request which Brokerage Firm 2 denied.  On or about March 6, 2016, ISEN and

Co-Conspirator 1 had telephone contact and, the same day, Co-Conspirator 1 emailed Brokerage Firm 2 requesting the placement of open ICEIF share orders to commence on March 7, 2016.

75.     On or about March 7, 2016, the defendant LAWRENCE ISEN had repeated telephone contact with more than one landline telephone number registered to the Boiler Room, with Co-Conspirator 1 and with ICEIF's Chief Executive Officer (the "ICEIF Company Insider"), an individual whose identity is known to the Grand Jury.  That same day, the PTP Brokerage Account, victim investors and brokerage accounts associated with Co-Conspirator 1 at Brokerage Firm 2 began trading in ICEIF stock.  On or about March 8, 2016, the Boiler Room Managers matched trades in ICEIF stock using the brokerage accounts in the names of Matz Relative 1 and Individual 1, and Matz and Co-Conspirator 1 had telephone contact.

76.     On or about March 16, 2016, Co-Conspirator 1 began wiring money to a Marketbyte bank account controlled by the defendant LAWRENCE ISEN, and the next day, that Marketbyte bank account began transferring large amounts of money to PTP's bank accounts. On or about April 7, 2016, ISEN had repeated telephone contact with the ICEIF Company Insider, and telephone numbers associated with Co-Conspirator 2 and a brokerage firm based in Malta ("Brokerage Firm 3"), an entity the identity of which is known to the Grand Jury.  In the days that followed, Brokerage Firm 3 sold ICEIF shares directly to victim investors.

77.     On or about May 2, 2016, the defendant LAWRENCE ISEN emailed Matz a spreadsheet that detailed trading data related to PTP's promotion of ICEIF stock, including the co-conspirators' profits from trades with certain victim investors.

78.     In approximately July 2016, a victim investor ("Investor 8"), an individual whose identity is known to the Grand Jury, spoke to an individual at the Boiler Room who

introduced himself as "Ian Grant," a false name used by one of the Boiler Room Co-Conspirators.  "Ian Grant" strongly recommended that Investor 8 purchase ICEIF shares, and assisted Investor 8 with completing his side of the trade.  According to trading data, Investor 8's purchase order for approximately 1,600 ICEIF shares was filled pursuant to a matched trade.

79.     As a result of the ICEIF stock manipulation scheme, the defendant LAWRENCE ISEN and his co-conspirators made more than $4,000,000 in gross trading profits.

B.     The Scheme to Launder Proceeds of the Stock Manipulation Schemes

80.     In or about and between 2014 and 2017, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS, together with others, engaged in a scheme to launder more than $10 million in proceeds of the fraudulent schemes to manipulate the share prices of NWMH, CESX, HECC and ICEIF.  CHARTIER, LEE, ISEN and WATTS, together with others, laundered proceeds of their schemes by transferring such proceeds in increments of greater than $10,000 from brokerage accounts that they and their co-conspirators controlled through accounts controlled by the Boiler Room Co-Conspirators.  At times, the defendants and their co-conspirators generated invoices to make these monetary transfers appear legitimate.

81.     In or about and between January 2014 and July 2017, the defendant STEPHANIE LEE frequently transferred the proceeds of illicit trading in increments greater than $10,000 derived from illicit trading out of the SCM Brokerage Account, for which she and the defendant JEFFREY CHARTIER were signatories.  LEE and CHARTIER knew that such funds were the proceeds of their and their co-conspirators' CESX and NWMH stock manipulation

schemes, and that such funds were being transferred through intermediary accounts to pay the Boiler Room for its work in connection with the schemes.

82.     In or about and between January 2014 and July 2017, the defendant JEFFREY CHARTIER frequently transferred the proceeds of illicit trading, in increments greater than $10,000, out of his personal brokerage account.  CHARTIER knew that such funds were the proceeds of his and his co-conspirators' CESX and NWMH stock manipulation schemes, and that such funds were being transferred through intermediary accounts to pay the Boiler Room for its work in connection with the schemes.

83.     In or about and between January 2014 and July 2017, the defendant MICHAEL WATTS frequently transferred the proceeds of illicit trading, in increments greater than $10,000, out of his personal brokerage account.  WATTS knew that such funds were the proceeds of his and his co-conspirators' HECC stock manipulation scheme, and that such funds were being transferred through intermediary accounts to pay the Boiler Room for its work in connection with the scheme.

84.     In or about and between January 2014 and July 2017, the defendant LAWRENCE ISEN, with the approval of his co-conspirators, frequently transferred the proceeds of illicit trading, in increments greater than $10,000, out of brokerage accounts controlled by his co-conspirators and into the Marketbyte bank account.  ISEN knew that such funds were the proceeds of his and his co-conspirators' HECC and ICEIF stock manipulation schemes, and that

such funds were being transferred through intermediary accounts to pay the Boiler Room for its work in connection with the schemes.

      C.     <u>CHARTIER and LEE's Obstructive Conduct</u>

      85.     On or about July 11, 2017, a grand jury sitting in the Eastern District of New York returned an indictment against the defendants JEFFREY CHARTIER and STEPHANIE LEE, together with others, on charges of securities fraud, securities fraud conspiracy, wire fraud conspiracy and money laundering conspiracy, for the above-described conduct. On or about July 12, 2017, agents from the Federal Bureau of Investigation ("FBI") arrested CHARTIER in Los Angeles, California, pursuant to an arrest warrant signed by a magistrate judge in the Eastern District of New York. On the same day, FBI agents arrested LEE in St. Petersburg, Florida, pursuant to an arrest warrant signed by a magistrate judge in the Eastern District of New York.

      86.     Following their arrests, the defendants JEFFREY CHARTIER and STEPHANIE LEE were read their <u>Miranda</u> rights. CHARTIER and LEE waived those rights and each agreed to be interviewed by FBI agents. Prior to the interviews, CHARTIER and LEE each were informed that they had been indicted in the Eastern District of New York and were facing charges in a criminal case in the Eastern District of New York.

      87.     In his interview, the defendant JEFFREY CHARTIER lied to the FBI agents about his and others' involvement in the above-described schemes. Among other things, he falsely informed the FBI agents, in sum and substance, that: (a) he had never heard of Power Traders Press, Trademasters Pro, Dacona Financial and MyStreet Research; (b) he did not participate in matched trades or wash trades; (c) he sold NWMH shares only via purchase agreements; (d) he sold his stock in NWMH and/or CESX only when the share prices were at a

low point; (e) he did not know Erik Matz; and (f) Anthony Vassallo had never done any work for him. At the time he made the statements to the FBI agents, CHARTIER knew these statements to be false.

88. In her interview, the defendant STEPHANIE LEE lied to the FBI agents about her and others' involvement in the above-described schemes. Among other things, she falsely informed the FBI agents, in sum and substance, that: (a) to her knowledge, PTP was not buying and selling stock, but only making stock purchase recommendations; (b) she compensated PTP only in stock; and (c) she was not trying to manipulate the price or trading volume of any stock. At the time she made these statements to the FBI agents, LEE knew these statements to be false.

COUNT ONE

(Conspiracy to Commit Securities Fraud)

89. The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

90. In or about and between August 2013 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (iii) engaging in one or more acts, practices

and courses of business which would and did operate as a fraud and deceit upon one or more

investors and potential investors in the Manipulated Public Companies, in connection with the

purchase and sale of investments in the Manipulated Public Companies, directly and indirectly,

by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15,

United States Code, Sections 78j(b) and 78ff.

91.     In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER,

STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS, together with others, did

commit and cause to be committed, among others, the following:

OVERT ACTS

(a)     On or about July 30, 2014, ISEN sent an email to WATTS and an

email address used by the Boiler Room (the "Boiler Room Email Address") with the subject line

"I believe this will suffice," which attached a consulting agreement between Dacona Financial

and Geoserve.  The text of the email read: "Let me know guys- I believe this covers all the

points."

(b)     On or about August 1, 2014, the Boiler Room Email Address sent

an email to ISEN and WATTS with the subject line "WIRING INSTRUCTIONS."  The text of

the email read: "Mike, here are the wiring instructions you requested.  Have a great weekend,"

and listed wiring instructions to a Dacona Financial bank account.

(c)     On or about August 6, 2014, LEE sent an email to her stock broker

(the "Broker"), an individual whose identity is known to the Grand Jury, copying Matz.  The text

of the email read: "Can you please send new corp account paperwork to Erik copied on this email.  He will be a good client :)."

        (d)     On or about August 14, 2014, Matz, using an email address that appeared to belong to someone else (the "Matz False Email Address"), sent an email to the Broker and attached documents entitled "Agreement For the purchase of stock frm Stephanie.pdf"; "CESX Cert Deposit Forms.pdf"; and "Contract Type A Docona [stet] .pdf." Two of the attached documents were signed by LEE.

        (e)     On or about September 15, 2014, LEE sent an email to the Matz False Email Address attaching an executed Stock Purchase Agreement for 200,000 shares of CESX from LEE to Dacona Financial.  The text of the email read: "This will go to [the Broker] with the other forms too.  You were offered to buy stock at a discount in conjunction with your consulting agreement for Type A if anyone ever asks but they shouldn't ☺."

        (f)     On or about September 30, 2014, LEE sent an email to the Matz False Email Address attaching a document entitled "Investor List Florida."  The text of the email read: "I never really used this list but its an 'investors list' in Florida I paid for…give it a shot get your new guys to start dialing.  May be a lot of disconnects but worth an afternoon to split it up amongst the guys its about 18,000 names and numbers ☺."

        (g)     On or about October 14, 2014, LEE sent an email to CHARTIER and the Matz False Email Address with the subject line "NOBO," attaching documents entitled "NOBO List Differneces [sic]" and "NOBO List Originals," which contained lists of non-objecting beneficial owners ("NOBO") of CESX stock.  The text of the email read: "Also this is all the stock that is accounted for this is how it breaks down roughly."

(h)    On or about March 24, 2015, LEE sent an email to the Matz False Email Address with the subject line "NWMH," attaching a document entitled "Type A Sales NWMH."   The text of the email read: "This is all trades through 3/23/15 totals 275,000."

(i)    In or about April 2015, CHARTIER sold his ownership stake in SCM to LEE.

(j)    On or about August 7, 2015, ISEN sent an email to Matz that contained contact information for Gleckman.   The text of the email read: "Below is Rob's contact info.   Please prepare an invoice for $61k made out to him for PR services.   Craig tells me the total proceeds from Rob's trades yesterday was $61,130.43."

(k)    On or about August 7, 2015, Matz, copying ISEN, sent an email to Gleckman attaching an invoice from PTP to Gleckman in the amount of approximately $61,000 for "PR Services."

(l)    On or about September 18, 2015, ISEN sent an email to the Boiler Room Email Address with the subject line "400k contract," attaching a purported consulting agreement between PTP and Geoserve.   The text of the email read: "Here you go.   I fixed it so it reads properly."

(m)    On or about October 26, 2015, ISEN sent an email to WATTS and the Boiler Room Email Address with the subject line "spread sheet," attaching a spreadsheet of HECC's trading volume in October 2015.   The text of the email read: "To be discussed."

(n)    On or about December 17, 2015, WATTS sent an email to ISEN, copying the Boiler Room Email and others, including a Geoserve employee (the "Geoserve Employee"), an individual whose identity is known to the Grand Jury, with the subject line "Re:ACH."   The text of the email read:

> Guys
> Please cut [the Geoserve Employee] some slack.
> Trade happened Monday 12-14
> The trade settled yesterday 12-16
> The funds hit the Geo account today. 12-17
> The funds have to stay 1 day and would not be eligible to wire
> until tomorrow.
> The ACH is just as fast when funds are wire in and have to go out
> immediately.
> It should be in your account in am.  Unless there is a problem
> receiving an ACH

WATTS's email was in response to an earlier email in which ISEN had instructed the Geoserve

Employee: "It is absolutely critical a wire is sent on the invoice that arrives in [the Boiler

Room's] account tomorrow."

        (o)     On or about May 25, 2016, ISEN sent an email to the Boiler Room

Email Address with the subject line "for the guys to use."  The email contained a link to an

internet address with purported news about ICEIF stock.

        (p)     On or about June 13, 2016, ISEN sent Matz an email that read, in

part: "I'm asking for a personal favor to clear up one final issue on out [sic] project. . . .  They

agreed to everything you asked for, 45/55 from here, 50/50 last week, 50/50 over 2.50. . . .  I've

ground them down to a rebate of $50k, and I'm asking you on a personal basis to consider this

and let's move forward.  No more foggy elements."

        (q)     On or about July 6, 2016, CHARTIER forwarded LEE an email

from a brokerage firm ("Brokerage Firm 4"), an entity the identity of which is known to the

Grand Jury, regarding the steps CHARTIER would be required to take to move his accounts

from Brokerage Firm 1 to Brokerage Firm 4.  CHARTIER's cover email read: "Oy veh!!!!!!!!!";

LEE's reply read: "Will take care of it."

(r)     On or about April 14, 2017, LEE sent an email to a potential

NWMH investor ("Investor 9"), an individual whose identity is known to the Grand Jury,

regarding a private sale of stock by CHARTIER to Investor 9.  Among other things, LEE stated

in the email: "[T]his company will uplist to national exchange which is a minimum of $3.00 just

to get on the exchange.  Especially with the new guys from CA coming in and taking over this

company.  His plan build and then sell to WM in three years with will be worth multi millions."

LEE also stated "Jeff [CHARTIER] will definitely fill you in on everything that is going on for

sure!!! Will have him call you today . . . "

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Wire Fraud)

92.     The allegations contained in paragraphs one through 88 are realleged and

incorporated as if fully set forth in this paragraph.

93.     In or about and between January 2014 and July 2017, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL

WATTS, together with others, did knowingly and intentionally conspire to devise a scheme and

artifice to defraud one or more investors and potential investors in the Manipulated Public

Companies, and to obtain money and property from them by means of one or more materially

false and fraudulent pretenses, representations and promises, and for the purpose of executing

such scheme and artifice, to transmit and cause to be transmitted by means of wire

32

communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Securities Fraud – The First CESX Stock Manipulation Scheme)

94.     The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

95.     In or about and between January 2014 and May 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER and STEPHANIE LEE, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in CESX, in connection with the purchase and sale of investments in CESX, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT FOUR

(Securities Fraud – The Second CESX Stock Manipulation Scheme)

96.    The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

97.    In or about and between June 2015 and October 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER and STEPHANIE LEE, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in CESX, in connection with the purchase and sale of investments in CESX, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT FIVE

(Securities Fraud – The NWMH Stock Manipulation Scheme)

98.    The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

34

99.     In or about and between December 2014 and February 2016, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JEFFREY CHARTIER and STEPHANIE LEE, together with others, did knowingly

and willfully use and employ one or more manipulative and deceptive devices and contrivances,

contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and

Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing one or more devices, schemes and artifices to defraud; (b) making one or more

untrue statements of material fact and omitting to state one or more material facts necessary in

order to make the statements made, in light of the circumstances in which they were made, not

misleading; and (c) engaging in one or more acts, practices and courses of business which would

and did operate as a fraud and deceit upon one or more investors and potential investors in

NWMH, in connection with the purchase and sale of investments in NWMH, directly and

indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States

Code, Sections 2 and 3551 et seq.)

## COUNT SIX
(Securities Fraud – The HECC Stock Manipulation Scheme)

100.     The allegations contained in paragraphs one through 88 are realleged and

incorporated as if fully set forth in this paragraph.

101.     In or about and between August 2014 and January 2016, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants LAWRENCE ISEN and MICHAEL WATTS, together with others, did knowingly

and willfully use and employ one or more manipulative and deceptive devices and contrivances,

35

contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and

Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing one or more devices, schemes and artifices to defraud; (b) making one or more

untrue statements of material fact and omitting to state one or more material facts necessary in

order to make the statements made, in light of the circumstances in which they were made, not

misleading; and (c) engaging in one or more acts, practices and courses of business which would

and did operate as a fraud and deceit upon one or more investors and potential investors in

HECC, in connection with the purchase and sale of investments in HECC, directly and

indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States

Code, Sections 2 and 3551 et seq.)

## COUNT SEVEN
(Securities Fraud – The ICEIF Stock Manipulation Scheme)

102.    The allegations contained in paragraphs one through 88 are realleged and

incorporated as if fully set forth in this paragraph.

103.    In or about and between February 2016 and July 2016, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant

LAWRENCE ISEN, together with others, did knowingly and willfully use and employ one or

more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules

and Regulations of the United States Securities and Exchange Commission, Title 17, Code of

Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and

artifices to defraud; (b) making one or more untrue statements of material fact and omitting to

state one or more material facts necessary in order to make the statements made, in light of the

circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in ICEIF, in connection with the purchase and sale of investments in ICEIF, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT EIGHT
(Conspiracy to Commit Money Laundering)

104.    The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

105.    In or about and between January 2014 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS, together with others, did knowingly and intentionally conspire to engage in monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: fraud in the sale of securities, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, all contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

37

COUNTS NINE THROUGH FIFTEEN
(Unlawful Monetary Transactions Over $10,000)

106.    The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

107.    In or about and between January 2014 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN and MICHAEL WATTS, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000, as set forth in the chart below, and that was derived from specified unlawful activity, to wit: fraud in the sale of securities, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, all contrary to Title 18, United States Code, Section 1957(a).

| COUNT | DEFENDANT(S) | MONETARY TRANSACTION |
|---|---|---|
| NINE | CHARTIER, LEE | On or about July 15, 2015, transferred or caused the transfer of approximately $30,000 in illicit trading proceeds from Type A Partners bank account **3407 in Florida to Dacona Financial LLC account **4146, in East Farmingdale, New York. |
| TEN | CHARTIER, LEE | On or about August 26, 2015, transferred or caused the transfer of approximately $29,000 in illicit trading proceeds from Type A Partners bank account **3407 in Florida to a bank account held in the name of Matz Relative 1, **0934, in Levittown, New York. |
| ELEVEN | CHARTIER, LEE | On or about August 26, 2015, transferred or caused the transfer of approximately $15,000 in illicit trading proceeds from Type A Partners bank account **3407 in Florida to PTP bank account **4551 in East Farmingdale, New York. |

| COUNT | DEFENDANT(S) | MONETARY TRANSACTION |
|---|---|---|
| TWELVE | WATTS, ISEN | On or about November 6, 2015, transferred or caused the transfer of approximately $59,500 in illicit trading proceeds from Geoserve Marketing bank account **8492 in Texas to PTP bank account **4551 in East Farmingdale, New York. |
| THIRTEEN | WATTS, ISEN | On or about December 17, 2015, transferred or caused the transfer of approximately $74,000 in illicit trading proceeds from Geoserve Marketing bank account **8492 in Texas to PTP bank account **4551 in East Farmingdale, New York. |
| FOURTEEN | WATTS, ISEN | On or about January 14, 2016, transferred or caused the transfer of approximately $84,664 in illicit trading proceeds from Geoserve Marketing bank account **8492 in Texas to PTP bank account **4551 in East Farmingdale, New York. |
| FIFTEEN | ISEN | On or about March 17, 2016, transferred or caused the transfer of approximately $126,000 from Marketbyte bank account **7317 in California to a bank account held in the name of Matz Relative 2, **4701, in East Farmingdale, New York. |

(Title 18, United States Code, Sections 1957(a), 1957(b), 2 and 3551 et seq.)

COUNT SIXTEEN
(Attempted Obstruction of Official Proceeding)

108.    The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

109.    On or about July 12, 2017, within the Eastern District of New York and elsewhere, the defendant JEFFREY CHARTIER did corruptly attempt to obstruct, influence and impede an official proceeding, to wit: a federal grand jury investigation and indicted criminal case, United States v. Jeffrey Chartier, et al., Criminal Docket No. 17-372 (JS), in the United States District Court for the Eastern District of New York (the "E.D.N.Y. Case").

(Title 18, United States Code, Sections 1512(c)(2) and 3551 et seq.)

39

## COUNT SEVENTEEN
(Attempted Obstruction of Official Proceeding)

110.    The allegations contained in paragraphs one through 88 are realleged and incorporated as if fully set forth in this paragraph.

111.    On or about July 12, 2017, within the Eastern District of New York and elsewhere, the defendant STEPHANIE LEE did corruptly attempt to obstruct, influence, and impede an official proceeding, to wit: the E.D.N.Y. Case.

(Title 18, United States Code, Sections 1512(c)(2) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH SEVEN

112.    The United States hereby gives notice to the defendants charged in Counts One through Seven that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including but not limited to the real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 10673 Hunters Glen Drive, San Diego, California 92130.

113.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS EIGHT THROUGH FIFTEEN

114.   The United States hereby gives notice to the defendants charged in Counts Eight through Fifteen that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property, including but not limited to the real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 10673 Hunters Glen Drive, San Diego, California 92130.

115.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK



F. #2016R01805
FORM DBD-34
JUN. 85

No. 17-CR-372 (S-2) (JS)

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*Jeffrey Chartier, Stephanie Lee, Lawrence Isen and Michael Watts,*

Defendants.

## SUPERSEDING INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b)(1), 1349, 1512(c)(2), 1956(h), 1957(a), 1957(b), 2 and
3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.* _____

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

**Whitman G.S. Knapp and Kaitlin T. Farrell, Assistant U.S. Attorneys (718) 254-6107/6072**