UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
UNITED STATES OF AMERICA,

      -against-                    <u>MEMORANDUM & ORDER</u>
                                      17-CR-0372-4(JS)

MICHAEL WATTS,

                       Defendant.
---------------------------------------X
APPEARANCES
For the
United States:         Whitman G.S. Knapp, Esq.
                    Kaitlin T. Farrell, Esq.
                    U.S. Attorney's Office
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201


For the Defendant
Michael Watts:        Joseph W. Ryan, Esq.
                    Joseph W. Ryan, Jr., P.C.
                    Melville Law Center
                    255 Old Country Road
                    Melville, New York 11747

SEYBERT, District Judge:

After a five-day trial, a jury convicted defendant Michael Watts ("Defendant") of conspiracy to commit securities fraud in violation of 18 U.S.C. §§ 371, 3551 <u>et seq</u>., conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 3551 <u>et seq</u>., securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 18 U.S.C. §§ 2, 3551 <u>et seq</u>., conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 3551 <u>et seq</u>., and three counts of money laundering in violation of 18 U.S.C. §§ 1957(a), 1957(b), 2, and 3551 <u>et seq</u>., arising out of his

participation in a stock manipulation scheme.  Currently before the Court is Defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.  (Def. Mot., D.E. 812; Def. Br., D.E. 812-1; Gov't Opp., D.E. 822; Def. Reply, D.E. 828.)  For the reasons that follow, Defendant's motion is DENIED.

BACKGROUND[1]

I.   The Superseding Indictment

On August 5, 2019, the Government filed a Superseding Indictment charging Defendant, along with co-defendant Lawrence Isen ("Isen"), among others,[2] with conspiracy to commit securities fraud, conspiracy to commit wire fraud, substantive securities fraud, conspiracy to commit money laundering, and three counts of money laundering, arising out of a scheme to defraud potential and actual investors in Hydrocarb Energy Corporation ("HECC").  (See Superseding Indictment, D.E. 465.)  The Superseding Indictment charged Defendant with "artificially controlling the price and volume of traded shares" in HECC by: (1) "artificially generating price movements and trading volume in the shares;" and

---

[1] The facts are recited herein as relevant to the Court's analysis and are drawn from the Docket, the Superseding Indictment, pre-trial proceedings, and the Trial Transcript ("Tr.").  The Trial Transcript available to the Court does not contain line numbering from pages 628 through 849. The Court presumes familiarity with the record.

[2] The Superseding Indictment also charged Isen, Jeffrey Chartier, and Stephanie Lee with schemes unrelated to HECC or Defendant.

(b) "material misrepresentations and omissions in [his] communications with victim investors about" HECC.  (Id. ¶ 31.)

To carry out this scheme, Defendant and Isen engaged co-defendant and cooperating witness Erik Matz ("Matz") who operated "My Street Research," a "purported financial services business" that "promoted the stocks of publicly traded companies to individual investors, primarily through cold-call campaigns and the circulation of a newsletter." (Id. ¶¶ 1, 27, 32, 65.)  In reality, My Street Research operated a "Boiler Room" that engaged in "manipulative trading patterns, including wash trades and matched trades, to drive up" the share prices of various publicly traded companies while its employees "aggressively and repeatedly called and emailed victim investors to purchase shares." (Id. ¶¶ 32-35.)  My Street Research operated under many names, including "Power Traders Press." (Id. ¶ 1.)  The Court refers to My Street Research, Power Traders Press, or any variation thereof, as the "Boiler Room," as it was referred to at trial.

The Superseding Indictment details that the relevant "HECC Stock Manipulation Scheme" involved concentrated match trading in HECC shares by Defendant, Isen, co-defendant Robert Gleckman ("Gleckman"), and the Boiler Room resulting in an inflated share price for HECC stock.  (Superseding Indictment ¶¶ 65-66.)  The Superseding Indictment also charges that Defendant facilitated the stock manipulation scheme by compensating and/or providing the

Boiler Room with HECC shares, through consulting agreements, that were "sold at a profit to unsuspecting victim investors." (Id. ¶ 32.)  The Superseding Indictment further charges that Defendant sold HECC shares directly to victim investors and profited $884,018 when he "sold a substantial number" of shares at the inflated price. (Id. ¶¶ 65-66, 70-71.)

II.  Pre-Trial

On April 11, 2018, Matz pled guilty to conspiracy to commit securities fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering.  (Min. Entry, D.E. 195; Indictment, D.E. 1.)  On August 2, 2019, Gleckman pled guilty to conspiracy to commit securities fraud.  (Min. Entry, D.E. 460.) Other Boiler Room employee/defendants also pled guilty. Defendant, Chartier, Isen, and Lee, none of whom worked in the Boiler Room, did not plead guilty and the Government proceeded to trial against them.

On June 26, 2019, Defendant filed a motion for trial severance, arguing that neither the Superseding Indictment nor the discovery produced implicated him in the non-HECC stock manipulation schemes. (Severance Mot., D.E. 421; Severance Br., D.E. 421-1.)  On August 6, 2019, the Court granted Defendant's motion.  (Min. Entry, D.E. 466.)

III. <u>The Trial Evidence</u>

A. <u>HECC, Generally</u>

HECC was a publicly traded "petroleum exploration and production" company that owned "21,000 square kilometers that borders Angola," Libya.  (Superseding Indictment ¶ 5; Tr. 736.) Defendant's brother, who testified in his defense at trial, formed HECC around September 2009.  (Tr. 734.)  Galveston Bay Energy ("Galveston Bay") was a subsidiary of HECC and operated 18,000 acres of oil producing fields in Texas.  (Tr. 735.)  Defendant invested $15 million in HECC and served as a consultant who sought financing from investors or public and investor relations firms. (Tr. 769; 771-72.)  Gleckman also invested in HECC and was a large shareholder.  (Tr. 436:14-21.)  By the end of 2014, oil prices started to decline and affected the oil and gas industry, including Galveston Bay's cash flow.  (Tr. 409:22-410:15; 740-42; 752-53.) To raise capital at this time, HECC entered into a consulting agreement with Defendant, dated June 27, 2015, "to create awareness and hire investor relation firms and public relation firms." (Tr. 755; 760; DX E.)  On April 13, 2016, HECC filed for bankruptcy. (GX 94.)

B. Defendant, Isen, Matz, and the Boiler Room

Around the end of July 2014, Isen introduced Defendant and Matz via conference call.[3]  (Tr. 72:24-73:12; 78:5-16; 778.) Matz testified that Defendant inquired as to how the Boiler Room operated and Matz provided examples of two companies he "previously promoted" and explained that he "increased volume, [ ] increased share price, and [ ] g[ave] support when it was needed."  (Tr. 80:17-20; 86:6-14.)  Matz expressed interest in promoting HECC but required "cash and possibly stock in the company" and that any agreement with the Boiler Room would reflect Keith Miller's signature[4] because Matz was "kicked out of the stock industry." (Tr. 86:23-87:9.)  Matz further explained to Defendant that the Boiler Room "supports" the stocks it promotes (Tr. 87:25-88:5), meaning that if a stock price dropped, the Boiler Room would buy the stock "back up, [and] bring it back to exactly where the price was, if exactly not where it was, as close as where we can get it so it looked like it never happened and then later on, we would cross those shares out to an investor" (Tr. 88:12-17, 89:14-24.) By "crossing shares with an investor," Matz elaborated that as a

---

[3] Defendant, Isen, and Gleckman were long-time friends and/or business acquaintances.  (Tr. 776-78.)

[4] Keith Miller was a Boiler Room employee.  (Tr. 87:4-9.)  Matz testified that he used many false names such as Keith Miller to operate the Boiler Room and even used "Joseph Matz," his brother's name, to form Power Traders Press.  (Tr. 150:17-24; 166:2-6.)

stock price dropped, the Boiler Room used trading accounts to "buy the stock back up" while it aggressively pushed the stock to investors to purchase. (Tr. 89:11-24.) As unknowing investors purchased the stock, the Boiler Room sold, or "cross[ed] out," the recently purchased stock. (Tr. 89:11-24.)

   C. Consulting Agreements between Defendant and the Boiler Room

        After the initial call, the Boiler Room entered into a consulting agreement, by Keith Miller, with Geoserve Marketing LLP,[5] by Defendant, effective August 1, 2014. (GX 101A at 2.) The consulting agreement required that Geoserve issue the Boiler Room 75,000 restricted HECC shares and pay $25,000 a month in six bi-weekly installments of $12,500. (Tr. 156:7-21; GX 101A.) The Boiler Room and Defendant entered into three similar consulting agreements: (1) effective November 1, 2014, for 50,000 restricted HECC shares and $25,000 a month to be paid in bi-weekly installments of $12,500 (GX 161A); (2) effective February 1, 2015, for 125,000 restricted HECC shares (GX 155A); and (3) effective July 17, 2015 for 400,000 restricted HECC shares (GX 144A). Although the consulting agreements state that the Boiler Room was an "independent consultant and has knowledge and experience to

---

[5] Defendant controlled Geoserve, a purported marketing firm; Isen controlled Marketbyte LLC, a purported investor relations and marketing firm; and Gleckman controlled Snap or Tap Productions LLC. (Superseding Indictment ¶¶ 9-11, 24-26.)

provide marketing as the Client believes can assist it in furthering execution of its public awareness" (see, e.g., GX 101A at 1), Matz testified that the Boiler Room did not actually perform any of those services but was "promoting, pushing penny stocks, increasing volume, and giving support when needed" (Tr. 168:2-172:12).[6] Matz also explained that the consulting agreements were required to clear the restricted HECC shares received as compensation with a brokerage firm. (Tr. 172:13-21; 246:15-21; see GX 113; GX 113A.)

D. The HECC Stock Manipulation Scheme

The Boiler Room pushed HECC stock to potential investors--victims--from approximately August 2014 through April 2016. (Tr. 90:12-15.) Matz described the Boiler Room's promotional activity in two phases. Initially, the Boiler Room increased HECC trade volume to keep the price "stable" and provided support where needed. (Tr. 90:16-23.) Eventually, the Boiler Room's operations "morphed into a different kind of animal" where the Boiler Room, with Defendant, Isen, among others, purchased free trading HECC shares and pushed a large volume of shares at a "fast and heavy pace." (Tr. 90:24-91:5; 91:13-92:5.)

---

[6] The Trial Transcript available to the Court incorrectly indicates "Watts – Direct" from pages 170 through 190. Pages 170 through 190 contain Matz's direct testimony.

1.   "Phase One" between August 2014 and October 2015

After signing the first consulting agreement, the Boiler Room started to push HECC stock.   (Tr. 90:5-14.)   During this period, the Boiler Room's "goal was to increase [HECC] volume, keep steady volume in there every day, support the stock when it needed support," and stabilize the price range.   (Tr. 153:5-17.) To accomplish this, the Boiler Room falsely represented itself as a research company and called potential investors--often elderly individuals--to promote the sale of HECC stock.   (Tr. 108:10-19; 138:14-17; GX 30 (HECC Script); GX 20 (Boiler Room Subscription Script).)   Several victim investors testified at trial to the aggressive nature and volume of calls from the Boiler Room and described the ways that the Boiler Room instructed the investors to purchase HECC stock.   The victim investors also testified to the financial losses they suffered in connection with their investment in HECC.

Starting in September 2014, and continuing throughout the Boiler Room's engagement, Defendant raised concerns regarding "shorting" as a cause for HECC's decline in value.[7]   (Tr. 176:22-178:18; GX 108; GX 137.)   Towards the end of the second consulting

---

[7] Defendant, as well as Matz and Gleckman, explained that shorting could "drive a stock price down" and occurs "when you sell a stock first, and you anticipate on buying it back at a lower price at a later date."   (Tr. 177:1-7.)

agreement, however, Defendant did not have the funds to pay the
Boiler Room. (Tr. 188:22-25.) Matz testified that Isen offered
to pay $25,000, as required under the agreement, on the condition
that Matz get him "out of enough stock"--or match trade[8]--to cover
the $25,000. (Tr. 188:22-189:24; GX 111A (Dec. 16, 2014 invoice
to Marketbyte for $12,500); GX 112A (Jan. 14, 2015 invoice to
Marketbyte for $12,500).) Around the same time, in December 2014,
Defendant and Isen asked Gleckman to pay $25,000 to finance a "PR
campaign" for HECC. (Tr. 435:18-436:13.) Gleckman, who testified
at trial as a Government witness, agreed to this plan. (Tr.
437:23-25.) On January 14, 2015, Isen emailed Gleckman an invoice
from his company MarketByte, dated January 5, 2015, indicating
that Gleckman paid $25,000 for "services on behalf of HECC" on
January 6, 2015. (GX 209; GX 209A.) Gleckman testified that
MarketByte did not provide those services but paid the invoice

---

[8] Deborah Oremland, an attorney at the Financial Regulatory
Authority ("FINRA"), testified as an expert witness in securities
terminology and regulations. (Tr. 622:15-17; 624:8-19.) She
explained that "wash" and "match" trades are "methods used to
manipulate the market." (Tr. 632.) A wash trade occurs where
"there's no change in ownership" and a person "buy[s] and sell[s]
[stock] with" oneself (Tr. 632-33) whereas a match trade is
"another type of coordinated trade where [one party] coordinate[s]
with a party on the other side of the transaction" to buy and sell
stock (Tr. 633-34). A match trade is manipulative because "the
public doesn't know that there's coordination involved. They just
see the trades. They see the price, and they see the volume, but
they don't know who is behind the trading, and they think that was
priced because the company that that reflects is the true value of
the company." (Tr. 634.) Match trades can increase a share price
for reasons "not based on normal market conditions." (Tr. 634.)

with the understanding that the $25,000 "made its way to" Matz in January 2015.  (Tr. 439:20-441:6.)

Around February 2015, Matz informed Defendant and Isen that he was "not happy" because HECC did not generate as much money as expected and threatened to stop promoting HECC if they did not provide him with additional funds or HECC stock.  (Tr. 250:2-11.) At some point thereafter, Defendant met Matz for dinner in New York City where Matz again expressed that he was not happy with HECC's performance.  (Tr. 268:10-22.)   Defendant conveyed his desire to continue with Matz and asked for time to come up with a "game plan."  (Tr. 269:1-5.)  After the dinner, Matz testified that Defendant had a "few different ideas" and suggested that Gleckman sell a certain number of shares for the Boiler Room to "cross out[, ]match up," and then invoice Gleckman for the proceeds from those crossed-out shares.  (Tr. 269:15-19; 270:6-271:11.) Consistent with this testimony, Gleckman testified that by May or June 2015, Defendant and Isen approached him with a two-part financing request for a "PR campaign" with Matz.  (Tr. 441:9-442:4.)  First, Defendant asked Gleckman to sell HECC shares and use the proceeds from those sales to pay Matz.  (Tr. 442:5-15.) Second, Matz wanted additional HECC shares and Defendant offered to sell Gleckman shares who would in turn sell the shares to Matz. (Tr. 442:16-25.)

As for the first plan, Defendant transferred approximately 262,000 HECC shares to Gleckman for Gleckman to sell and use the proceeds to pay Matz.[9] (Tr. 443:19-444:1.) However, these shares were restricted: neither Defendant nor Gleckman could sell them on the open market.[10] (Tr. 459:18-21.) To "free-up" the shares, Defendant and Gleckman executed and obtained certain documents, including a consulting agreement and an attorney opinion letter. (Tr. 445:22-24; GX 229; GX 229A-229C.) The consulting agreement, dated June 25, 2015, stated that "Gleckman agrees to provide its specialized services to Geoserve with a focus on" HECC in exchange for the restricted shares. (GX 229C at 1, ¶ 3; Tr. 462:7-464:1.) Gleckman testified that he did not provide consulting services but signed the agreement to "sell [the shares] and to give the proceeds to Erik Matz." (Tr. 464:2-9.) He further testified that Austin Legal Group ("Austin Legal") provided an opinion letter that, as explained by Ms. Oremland, stated why

---

[9] The approximate 262,000 shares represented a portion of the shares Defendant owed Gleckman from prior transactions. (Tr. 437:3-22.)

[10] Ms. Oremland explained that restricted shares cannot be immediately sold in the market whereas unrestricted shares, or "free-trading shares," can be sold at any time. (Tr. 628; 630.) She also explained that SEC Rule 144 ("Rule 144") governs the resale of restricted shares and detailed the process to convert, or "free-up," Rule 144 restricted shares into free-trading shares. (Tr. 629-31.)

restricted shares should become free-trading under Rule 144. (Tr. 459:18-460:7; 465:17-466:10; 630-31; GX 229A.)

In July 2015, the HECC shares became free trading and Gleckman sold the shares over six to eight weeks. (Tr. 445:1-6; 466:9-17.) Gleckman testified that he asked his broker to sell "according to what the market would bear." (Tr. 466:18-20.) He also testified that Isen told him when to "sell more to pay" Matz and when "there were buyers coming in." (Tr. 466:21-467:2.) Matz testified that he relayed trade instructions to Gleckman. (Tr. 273:3-13.) The Boiler Room sent Gleckman invoices for "PR services" on August 7, 2015 for $61,000 (GX 69), August 28, 2015 for $64,000 (GX 71), September 9, 2015 for $81,000 (GX 72), September 29, 2015 for $75,000 (GX 73), and October 15, 2015 for $68,500 (GX 74). Gleckman testified that these invoices were not for "PR Services" but represented the amount he made selling the newly unrestricted HECC stock. (See generally Tr. 470:25-476:22.) Matz similarly testified that these invoices reflected the amount of HECC "shares that [the Boiler Room] had gotten [Gleckman] out of" through "cross[ing] and match[]" trades. (Tr. 273:3-13; see GX 133; see also Tr. 659-60; GX 378 (summary chart prepared by Ms. Oremland listing the amount in proceeds that Gleckman made from selling HECC stock on August 6, 2015 ($61,130.43), August 24, 2015 ($65,583.46), August 26 - September 4, 2015 ($81,212.06),

September 21-28, 2015 ($75,616.88), and September 30 - October 12, 2015 ($69,484.).)

As for the second part the plan, around June and July 2015, Defendant sold Gleckman 50,000 HECC shares for $500 and Gleckman sold those shares to Matz for $500. (Tr. 477:18-478:14.) To finalize this agreement, Gleckman and the Boiler Room received or executed certain documents, including an attorney opinion letter and a stock purchase agreement. (Tr. 478:21-479:10; GX 130A-130F.) A brokerage firm denied the transfer because, among other reasons, "the name of the customer suggests that the customer may be involved in stock promotion or analysis," and if so, any promotional activity "should be addressed in the legal opinion." (GX 131; Tr. 264:9-10.)

2.  "Phase Two" between October 2015 and April 2016

From October 2015 through early 2016, the Boiler Room "drastically changed" its promotion of HECC and started "pushing the stock very heavily" through "fast trades [and] fast volume" to "get out as much stock and make as much money as we could as quick as possible." (Tr. 298:17-299:10.) During this period, Matz communicated with Defendant "a lot more often"[11] and provided

---

[11] The Government called Jessica Anspacher, a staff operations specialist for the FBI, who reviewed phone records. (Tr. 550:6-565:15.) Ms. Anspacher prepared two charts reflecting that Defendant and Matz (or the Boiler Room) exchanged 264 phone calls between August 6, 2015 and March 3, 2016 (GX 367B) as compared to

14

Defendant, or Defendant's broker, with "trade instructions, how much stock to sell, [and] what price to put it at." (Tr. 299:11-300:8.) Defendant similarly testified that the Boiler Room informed him when it had buyers "coming in" and to "watch [his] screen." (Tr. 783.)

  During this "phase," Matz testified that he agreed with Defendant that Defendant would sell HECC stock from his personal account, Matz would "get him out" of that stock, and Defendant would wire Matz 50 percent of the sale proceeds. (Tr. 301:13-22.) For example, on November 4, 2015, Isen asked Matz to send Defendant (through Geoserve) an invoice for $59,500. (GX 147 (Nov. 4, 2015 email); GX 149A (Nov. 4, 2015 invoice from the Boiler Room to Geoserve for "PR Services" totaling $59,500).) Matz testified that the $59,500 invoice was not for "PR Services," as indicated, but "represented half of what [he and Defendant] generated in trades" from Matz instructing Defendant "where to place orders." (Tr. 301:17-19; 303:22-304:4.) According to Matz, another invoice, dated December 1, 2015 and for "PR Services" totaling $195,000, also represented 50 percent of the amount Defendant generated from Matz's trade instructions. (GX 150A; Tr. 305:9-306:4.) The Boiler Room continued to push HECC through April 2016

---

61 phone calls between August 1, 2014 and August 5, 2015 (GX 367A).

(Tr. 328:16-20) and on April 13, 2016, HECC filed for bankruptcy (GX 94).

E. HECC Trading Data

The Government introduced HECC's raw blue sheet data[12] between October 1, 2015 and February 25, 2016 (GX 370) and January 2, 2015 and December 31, 2015 (GX 371).  Ms. Oremland reviewed HECC's trading data and phone records and prepared many summary charts.[13]  (See Tr. 621-98.)

One chart summarized Bloomberg trade data[14] from October 29, 2015 to April 15, 2016 and reflected that HECC's stock price rose above $2.50 in November 2015 and decreased to $0 by April 2016.  (GX 376; Tr. 643-45.)  Another chart compared Defendant's sale of HECC stock with the Boiler Room's or victim's purchase of HECC stock from October 29, 2015 to February 23, 2016. (See GX 373.)  This chart illustrated that Defendant sold an "identical or extremely close" volume of HECC stock as compared to

---

[12] Blue Sheet data contains "all of the trading for a particular stock for a set period of time" (Tr. 639) and is "generated electronically and . . . requested from the [Securities and Exchange Commission] or FINRA to all the market participants" (Tr. 677-78).

[13] The Court details the charts necessary to its analysis.  Ms. Oremland also testified to transfers in and out of Defendant's brokerage and bank accounts that "coincided" with the trading data. (Tr. 660-66.)

[14] Bloomberg data shows what is "reported to the public, the price and the volume."  (Tr. 679; GX 377.)

the Boiler Room's purchase of HECC stock. (Tr. 645; GX 373; see also Tr. 645-46 (Ms. Oremland testifying that GX 375 contained the same information in GX 373, adjusted).) A separate chart compared Defendant's telephone records with his HECC trade data from October 30, 2015, November 25, 2015, December 14, 2015, December 24, 2015, January 7, 2016, and January 8, 2016. (See GX 374.) Through this chart, Ms. Oremland described a pattern: (1) Defendant and the Boiler Room exchanged calls, (2) shortly thereafter, Defendant, by his broker or on his own, sold a certain number of HECC shares, and (3) almost immediately after Defendant's sale, a victim purchased the same, or near same, number of HECC shares at the same price. (Tr. 646-56; GX 374; see also GX 372 (chart reflecting Defendant's calls and trading data on January 6, 2016).) A different chart compared the Boiler Room's HECC trades with Defendant's HECC trades from October 29, 2015 to January 6, 2016. (GX 382.) According to Ms. Oremland, this chart reflected that the Boiler Room's accounts and Defendant's accounts traded a similar volume of HECC shares at or around the same time and for the same price. (Tr. 658.)

The Government also called Christopher Petrellese, a forensic accountant for the FBI, who prepared charts and spreadsheets based on his review of bank records and brokerage accounts. (Tr. 574-609; GX 350-58.) He also prepared charts that reflected "certain transactions" in bank accounts (Tr. 579:15-

580:6) from August 1, 2014 to April 30, 2016 (GX 361A; GX 362),
November 6, 2015 (GX 361B), December 17, 2015 (GX 361C), and
January 13-14, 2016 (GX 361D).  Other than these charts and the
voluminous Blue Sheet data in its raw form, the Government did not
introduce charts or testimony that summarized or described HECC
trade data between August 2014 and October 2015.

F. <u>The Defense</u>

Defendant and his brother testified to HECC's legitimate
operations, Defendant's role as a consultant who raised investor
awareness for HECC, and the significant financial losses Defendant
suffered in connection with his investment in HECC.  Defendant
also testified to "shorting" and the drop in the price of oil as
reasons for HECC's decline.  Defendant further testified as to the
circumstances that led to his transactions with the Boiler Room,
that Matz pressured him for payment, and denied any knowledge that
Matz or the Boiler Room were engaged in match trading or
fraudulently inflating the price of HECC stock.  (Tr. 727-828.)

G. Summations and Deliberations

In closing, the Government summarized the evidence and,
as relevant here, argued that the jury should find Defendant guilty
of securities fraud because Defendant (1) matched traded against
the Boiler Room, an "act, practice or course of business that
operated as a fraud on [HECC] purchasers" (Tr. 900:7-901:10), and
(2) employed a "device, scheme or artifice to defraud in connection

18

with the sale of" HECC by signing a "sham consulting agreement in order to free up those shares to give them to Robert Gleckman so that Gleckman could sell them and pay the Boiler Room" (Tr. 901:11-15).

During deliberations, the Jury requested "clarification on Count 1 [(conspiracy to commit securities fraud)]. Specifically what the charge states and what we need to determine. Are we allowed to ask specifically about conspiracy? Please define further." (Court Ex. 4, D.E. 584, at ECF p. 5.) The Defense responded:

> Defense: What I see is the issue -- the factual issue is what is the securities fraud? That is the thrust of the charge here. Is it the matching of trades? Is it an artifice to defraud, or is it these consulting agreements of free shares. So that, I have no doubt, is the way the summation went, government's summation, that they are confused as to whether or not freeing the shares is part of securities fraud or whether it's the matching of trades, and I suggest -- I think that's the basic con here. I suggest that you send them in a note to please explain what you mean by clarification, and go no further.
>
> * * *
>
> Defense: Since they are the judges of the facts, this question, what we need to determine is the issue what is confronting this jury. In this case he's tried on the matched trades. That was the thrust. . . . False consulting agreement, that was to free the stock that could be manipulated by matched trades. It was a means to get the matched trades conspiracy. The consulting agreement is only to free stock.

19

Gov't:       That's securities fraud. Having a false
             consulting agreement to free up stock, that
             is securities fraud.

Defense:     That's not the charge in this case.

Gov't:        Yes, it is.

Defense:     Manipulation of the stock market by matched
             trades, and the means to accomplish that,
             according to the government's own theory,
             was that they had to free up stock to pay
             Matz, and that freed stock had to be sold.
             In fact, Matz wanted some of that free
             stock, as I recall. So this whole consulting
             scenario that is in the overt acts, and then
             emphasized in the summation, really doesn't
             allow the jury to determine what the
             ultimate fact determination here is, and the
             material fact in this case for them to
             determine is whether or not it was
             manipulation of the market by scheme and
             artifice to defraud by matched trades.

The Court:   I don't think it was one exclusive vehicle.
             They had more than one way to do it. Part of
             it was a consulting agreement, because the
             defendant essentially said I'm going to do
             these, or the defendant or his
             coconspirators, et cetera, said I'm going to
             do these fake consulting agreements and I
             will give you stock in exchange for it.
             That's the same thing they are talking about
             with matched and washed trades.

Defense:     Robert Gleckman never testified or even
             suggested that this was to create matched
             trades. It was merely to free the stock.

The Court:   So that they can have matched trades, I
             assume.

Defense:     To free the stock so that – that's correct.
             The core of this offense is the matched
             trading. We had the expert testifying that's
             what this case is all about. It is not about

> whether it is a securities fraud to free up 260,000 shares.

Gov't:   This case is absolutely about that. That's precisely what Robert Gleckman allocuted to here. That's what your Honor accepted for his allocution, entering into these false consulting agreements in order to free up shares to sell them. That's securities fraud.

Defense:   I completely disagree. Robert Gleckman testified the reason he pleaded guilty was not to participate in this conspiracy. It was because he had a conflict of interest selling the stock and at the same time owning the stock.

                              ***

Gov't:   That's not the only criminal act that he undertook. In fact, what he allocuted to was entering into this false consulting agreement in order to free up Hydrocarb shares so that they could be sold to pay the Boiler Room.

Defense:   Entering into a false consulting agreement to free up securities is securities fraud? That's not the charge in this case.

Gov't:   It is.

(Tr. 1040:7-1044:14.)  One hour later, the Jury reached a verdict.

(Court Ex. 6, D.E. 584, at ECF p. 4.)

## IV.   Post-Trial Proceedings

On February 10, 2020, the trial against co-defendants Chartier and Isen began before the undersigned.[15]  (Min. Entry, D.E. 729.)  On March 18, 2020, a jury convicted Chartier and Isen on all counts.  (Min. Entry, D.E. 797.)  On April 15, 2020,

---

[15] Stephanie Lee pled guilty after Defendant's trial.

Defendant filed this motion and on July 13, 2020, the Court heard oral argument (see Min. Entry, D.E. 851).

DISCUSSION

I.   Legal Standard

Federal Rule of Criminal Procedure 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict." United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995). A district court may grant a Rule 33 motion only in "extraordinary circumstances," United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (quotation marks and citation omitted), and only if there exists "a real concern that an innocent person may have been convicted," United States v. Parkes, 497 F.3d 220, 232 (2d Cir. 2007) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 134. When deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013) (quoting Ferguson, 246 F.3d at 134).

II.   <u>Analysis</u>

   A. <u>Alternate Theory of Guilt as a Constructive Amendment or Variance</u>

      Defendant argues that a new trial is warranted in the interest of justice because the Government argued an "alternate theory of guilt" in closing not charged in the Superseding Indictment: that Defendant committed securities fraud by freeing the approximate 262,000 restricted HECC shares under false pretenses in violation of Rule 144.  (Def. Br. at 1, 11-13; Def. Reply at 5.)  According to Defendant, this "alternate theory" differed from the "core criminality" alleged in the indictment-- that Defendant committed securities fraud by match trading against the Boiler Room.  (Def. Br. at 1-2, 12-13; Def. Reply at 3-4.)

      The Government responds that the allegations in the Superseding Indictment, including the overt acts alleged in support of the conspiracy charge, relate to freeing-up the restricted HECC shares.  (Gov't Opp. at 9-10.)  The Government also argues that it did not shift its theory of guilt because Defendant's "use of Gleckman as [a] middleman to free up shares and pay the Boiler Room was merely one facet of [Defendant's] multidimensional securities fraud scheme" and the "lies" he told in connection with freeing the restricted shares "provided compelling evidence that [Defendant] engaged in matched and wash trading with Matz" to dump his shares.  (Gov't Opp. at 10-11.)

The Court construes Defendant's argument as asserting a new trial is warranted because the "alternate theory of guilt" constituted a constructive amendment or prejudicial variance in violation of the Fifth Amendment. (See Def. Reply at 3-4 ("The prosecution's strategy deprived Mr. Watts not only of his right to a fair trial but to due process of law under the Fifth Amendment to the U.S. Constitution as a result of [a] prejudicial variance from the 'pump and dump' scheme [ ] charged in the indictment.")). "An indictment has been constructively amended 'when the government's presentation of evidence and the district court's jury instructions combine to modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'" United States v. Kenner, No. 13-CR-0607, 2019 WL 6498699, at *9 (E.D.N.Y. Dec. 3, 2019) (quoting United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996)) (internal quotation marks omitted). By contrast, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." United States v. Lebedev, 932 F.3d 40, 54 (2d Cir. 2019) (quoting United States v. Dove, 884 F.3d 138, 149 (2d Cir. 2018)). "The most significant difference between a variance and a constructive amendment is that the latter is a per se violation of the Fifth Amendment, whereas

'a defendant must show prejudice in order to prevail on a variance claim.'" Kenner, 2019 WL 6498699, at *10 (quoting United States v. Frank, 156 F.3d 332, 338 n.5 (2d Cir. 1998)). "A defendant fails to show that he has been prejudiced by the variance when 'the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'" Id. (quoting United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir. 1994)).

After a careful review of the record, and having presided over Defendant's trial, the Court finds that no constructive amendment or variance occurred here. The Government did not argue, and the Court did not charge, that the jury could find Defendant guilty of securities fraud by violating Rule 144 when he executed documents to free-up the restricted shares. Nor did the Government introduce a new theory of guilt during summations by reciting the trial evidence and emphasizing that Defendant executed consulting agreements for services he did not provide and did not receive. Rather, from the filing of the Superseding Indictment through trial, the Government never departed from its core allegations that the Defendant, with others, engaged in a scheme to defraud HECC investors by hiring and coordinating with the Boiler Room to

25

create an artificial demand for HECC stock through aggressive cold calls to victim-investors and manipulative trading.

As part of this scheme, the Superseding Indictment states:

> [t]o compensate the Boiler Room <u>and to facilitate the stock manipulation</u>, the defendants provided the Boiler Room with shares from [HECC] for free or at below-market prices <u>through stock purchase and consulting agreements, which shares the Boiler Room also sold at a profit to unsuspecting victim investors</u>.
>
>               ***
>
> ISEN, who controlled Marketbyte, facilitated the share transfers between Geoserve, Gleckman and the Boiler Room by, <u>inter</u> <u>alia</u>, providing supporting documentation to a brokerage firm . . . , to ensure the successful deposit of HECC shares into a Boiler Room brokerage account.

(Superseding Indictment ¶¶ 32, 67) (emphasis added). The Superseding Indictment also charges:

> Once shares in [HECC] were transferred to the Boiler Room . . . MICHAEL WATTS, together with the Boiler Room Managers, engaged in manipulative trading patterns, including wash trades and matched trades, to drive up the price of the shares, while account executives at the Boiler Room . . . aggressively and repeatedly called and emailed victim investors to purchase shares in the Manipulated Public Companies.

(Superseding Indictment ¶ 33.) Further, Defendant notes that the Superseding Indictment added overt acts "not previously alleged" that "were <u>based upon documents relating to the conversion of Rule 144 restricted HECC stock</u>."  (Def. Br. at 4-5) (emphasis added).

26

These allegations were incorporated into the securities fraud charge.  (Superseding Indictment ¶¶ 100-01.)  It is true that the Superseding Indictment does not specifically reference the documents surrounding the restricted share conversion.  However, the Government's theory that Defendant participated in the scheme by executing documents to convert the restricted HECC shares to be manipulated on the market "did not change 'the essence of the crime, in general terms,' which remained throughout" all stages of the prosecution.  United States v. Daugerdas, 837 F.3d 212, 225 (2d Cir. 2016) (quoting United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012)).  Indeed, evidence that Defendant and Gleckman executed documents for the sole purpose of freeing the HECC restricted shares as a means to pay the Boiler Room to continue its operations provided the "'particulars of how [Defendant] effected the crime,' and the [G]overnment's reliance on this theory of liability did not amount to a constructive amendment."  Id. (quoting D'Amelio, 683 F.3d at 417-18); see also United States v. Rigas, 490 F.3d 208, 230 (2d Cir. 2007).  As such, the Court finds that no constructive amendment or variance occurred.

Even assuming the introduction of evidence surrounding the restricted share conversion constituted a variance, Defendant has not established that "he was 'substantial[ly] prejudice[d]' by this evidence."  United States v. Gross, No. 15-CR-0769, 2017 WL 4685111, at *32 (S.D.N.Y. Oct. 18, 2017), aff'd sub nom. United

27

States v. Lebedev, cited supra, (quoting Rigas, 490 F.3d at 226)
(alterations in original).  The Government's opening statements
put Defendant on notice that it intended to argue that Defendant
participated in the conspiracy and committed securities fraud in
two ways: by executing the documents necessary to free-up the
restricted shares for Gleckman to trade and use the proceeds to
pay the Boiler Room to continue its corrupt promotion of HECC and
by coordinating with the Boiler Room to match trade and dump his
shares to victim investors.[16]  (See Tr. 21:6-25 (the Government
stating in opening that Defendant enlisted Gleckman as a conduit
to free-up the restricted shares by "creating fake documents" and
thus "manipulated the system so the shares could be sold on the
open market and then used to pay the Boiler Room."); Tr. 22:1-17
(the Government stating in opening that "ultimately" Defendant and
the Boiler Room "controlled both the sale and the purchase" of

---

[16] Moreover, at the August 6, 2019 pre-trial conference, the Court
asked the Government to identify the relevant match trades at issue
and the Government clarified that "the vast majority of the volume
of trading was attributable to the [B]oiler [R]oom and the
coconspirators in this case." (Aug. 6, 2019 Tr. 14:11-13.)  Thus,
there should have been no surprise that the Government argued that
Defendant participated in the scheme by, among other ways,
executing the documents necessary to free-up restricted HECC
shares for Gleckman and/or the Boiler Room to manipulatively trade.
Furthermore, at Gleckman's plea allocution, the Government stated
that if he proceeded to trial, it would have offered evidence that
HECC "shares were being manipulated in connection with these false
invoices and were used [ ] to enable the shares to be traded.  And
then those shares that were traded were unloaded on unwitting
victim investors."  (Aug. 2, 2019 Tr. 18:10-14.)  This is
consistent with the Government's theory against Defendant here.

HECC stock because "[o]nce a victim took the bait and placed an online order to purchase [HECC], the Boiler Room [ ] would call the [D]efendant and direct him to place a corresponding order to sell his own shares," i.e., "to dump" his stock on investors).)

Further, as detailed above, the Government developed the first theory by adducing evidence that Gleckman and Defendant executed a consulting agreement, among other documents, for the sole purpose of converting restricted HECC shares into free-trading shares for Gleckman to trade and use the proceeds to pay the Boiler Room.   The Government also introduced evidence that Defendant visited the Boiler Room, knew how it operated, and presented invoices that were not for "PR services" but reflected the amount of HECC "shares that [the Boiler Room] had gotten [Gleckman] out of" through "cross[ing] and match[ ]" trades.  (Tr. 273:3-13.)  Accordingly, the Government did not argue that criminal liability turned exclusively on "false" consulting agreements or the purported "lies" Defendant told to Austin Legal when converting the restricted shares into free-trading shares.   Rather, this evidence tracks one theory of the scheme to defraud as presented in the Superseding Indictment, opening statements, and again in summations.  (Tr. 901:11-15 (the Government arguing in closing that Defendant "employed a device, scheme or artifice to defraud in connection with the sale of [HECC] stock when he signed a sham consulting agreement in order to free up those shares to give them

to Robert Gleckman so that Gleckman could sell them and pay the Boiler Room.").)

Finally, Defendant's claim to prejudice and unfair surprise is undermined by the Government's arguments in opposition to his Rule 29 motion for judgment of acquittal:

> It actually does not matter what Robert Gleckman k[n]ew about the [B]oiler [R]oom because Robert Gleckman, Lawrence Isen, and the defendant separately committed acts of securities [ ] fraud when the defendant and Gleckman himself executed a false consulting agreement in order to free up 262,000 shares, in order to trade them on the open market and pay Eric Matz. The fact of a false consulting agreement itself in order to free up shares is itself securities fraud . . .

(Tr. 723.) Counsel did not object to this argument or to any of the evidence introduced in support of this theory. United States v. Kaplan, 490 F.3d 110, 130 (2d Cir. 2007) (no constructive amendment or variance where "counsel did not object to the admission of the false statements not specified in the bill of particulars, nor did he request a continuance when they were introduced.").

In view of the above, there was no "stealth strategy intended to place the defense at a tactical disadvantage" (Def. Br. at 13) and Defendant has "not shown the 'substantial prejudice' required to warrant reversal on variance grounds." Rigas, 490 F.3d at 230; see United States v. Salameh, 152 F.3d 88, 139-40 (2d Cir. 1998) (the government did not unfairly raise new theories of

guilt during summations where its theory of criminal liability remained consistent throughout opening and closing statements); United States v. Miller, No. 17-CR-0415, 2019 WL 2232124, at *9 (E.D.N.Y. May 23, 2019) (same); United States v. Ng Lap Seng, No. 15-CR-0706, 2018 WL 2287101, at *11 (S.D.N.Y. May 9, 2018) (denying Rule 33 motion where the defendant argued the government expanded the "core criminality" charged by relying on certain documents not referenced in the indictment and where the defendant's actions in connection with those documents "were part of that course of [bribery] conduct, not part of a set of facts separate from what was alleged in" the indictment); see also Gross, 2017 WL 4685111, at *33-35; cf. Siddiqi v. United States, 98 F.3d 1427 (2d Cir. 1996) (conviction vacated as a miscarriage of justice where the government shifted its theory of guilt during summations, again on remand to the district court, and again in response to defendant's habeas petition); cf. United States v. Sakoc, 115 F. Supp. 3d 475 (D. Vt. 2015) (granting Rule 33 motion and finding a constructive amendment or variance where the indictment charged defendant with failing to disclose criminal conduct arising out of "a specific date and a specific category of violent crimes against a specific set of women" on immigration and naturalization forms and in summation the government argued the jury could convict for conduct that occurred on dates other than those specifically charged in the indictment).

B. Sufficiency of the Evidence

To the extent it is asserted, the Court rejects the argument that the securities fraud conviction cannot stand because there is no direct evidence of Defendant, or the Boiler Room, match trading in connection with the conversion of restricted shares. Regardless of whether this theory was proved, "the evidence was sufficient to support the ["phase two" match trading] theory" under Rule 10b-5(c) (see Background § III.D.2, supra), and "the Supreme Court has held that a verdict should be affirmed when two theories of an offense are submitted to the jury and the evidence supports one theory but not the other." United States v. Rutkoske, 506 F.3d 170, 176 (2d Cir. 2007) (citing Griffin v. United States, 502 U.S. 46, 56-60, 112 S. Ct. 466, 116 L. Ed.2d 371 (1991)) (further citations omitted); see also United States v. Nekritin, No. 10-CR-0491, 2012 WL 37536, at *4 (E.D.N.Y. Jan. 9, 2012); United States v. Greebel, No. 15-CR-0637, 2017 WL 3610570, at *5 (E.D.N.Y. Aug. 4, 2017) (the "'three prongs' of Rule 10b-5 'are disjunctive . . . such that the government can obtain a conviction by proving any one of them.'" (quoting United States v. Wey, No. 15-CR-0611, 2017 WL 237651, at *6 (S.D.N.Y. Jan. 18, 2017))).

Defendant may also argue that the jury improperly convicted him of conspiracy to commit securities fraud based on an incorrect assumption that a Rule 144 violation constituted the underlying securities fraud and not match trading. (See, e.g.,

Oral Arg. Tr. 14:8-18.)   For the reasons stated supra, the Court disagrees and, in any event, the evidence supported the jury's conspiracy verdict.   While there is no direct evidence of match trading at or around the time Defendant and Gleckman converted the restricted HECC shares, Matz testified in detail that the Boiler Room was not a legitimate operation, he was actively involved in the Boiler Room's fraudulent activities, he explained to Defendant how the Boiler Room operated, and that the Boiler Room "supported" HECC stock by aggressively cold calling investors and by trading stock to keep the price "stable."   Matz testified that he informed Defendant that he would stop promoting HECC unless Defendant provided additional stock.   In response, Defendant, with Gleckman, executed the documents necessary to convert the restricted HECC shares solely for Gleckman to trade and pay the Boiler Room with those proceeds.   (Tr.  270:10-271:11  (Matz  testifying  that Defendant had a "few different ideas" to keep the Boiler Room engaged, including that Gleckman could sell HECC shares for the Boiler Room to "cross out[, and] match up," and invoice Gleckman for the proceeds of those traes).)

Both Defendant and Gleckman testified that they had "no knowledge that Matz was committing crimes in the Boiler Room" (see, e.g., Def. Br. at 5), however, Matz testified that he coordinated match trades with Gleckman by relaying trade instructions to Gleckman and/or Gleckman's broker.   (See, e.g., Tr. 275:16-22.)

Defendant testified to the same. (Tr. 783.) As with all credibility determinations, the jury was entitled to believe Matz's version of events. United States v. Friedman, 998 F.2d 53, 57 (2d Cir. 1993) (a jury is "entitled to conclude that [defendant's] version of the events was false and thereby infer his guilt."); United States v. Riggi, 541 F.3d 94, 110 (2d Cir. 2008) ("[A] conviction may be supported only by the uncorroborated testimony of a single accomplice . . . if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt. Any lack of corroboration goes merely to the weight of the evidence, not to its sufficiency." (quoting United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990))). Moreover, the Government presented evidence that later in the conspiracy, Defendant coordinated match trades with the Boiler Room. Thus, while "[t]he specific methods [Defendant] used may have evolved," the "objective of the conspiracy remained the same[:]" to create an artificial demand for HECC stock. United States v. Vilar, 729 F.3d 62, 92 (2d Cir. 2013).

C. "Newly Discovered" Evidence

Defendant argues that the Government's "shifting theories of guilt . . .could not be adequately met until evidence was discovered in the Isen trial." (Def. Br. at 12.) Specifically, Defendant argues that Government Exhibit 79, a legal opinion issued by Austin Legal (the "Austin Legal Opinion") to

convert the restricted HECC shares proves that "the freeing-up of the Rule 144 restricted stock was done in good faith and in full compliance with SEC requirements." (See GX 79, D.E. 812-2; Def. Br. at 1-2.)

"A motion for a new trial on the ground of newly discovered evidence is granted 'only in the most extraordinary circumstances.'" Parkes, 497 F.3d at 233 (quoting United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993)) (emphasis in original). "Newly discovered evidence supports the grant of a new trial only if the defendant demonstrates that the evidence could not have been discovered through the exercise of due diligence before or during trial, and that the evidence is 'so material and noncumulative that its admission would probably lead to an acquittal.'" Id. (quoting United States v. Zagari, 111 F.3d 307, 322 (2d Cir. 1997)) (internal quotation marks omitted).

The Court has reviewed Gleckman's testimony at the Isen trial and finds it consistent with his testimony at Defendant's trial. Moreover, Defendant did not "newly discover" the Austin Legal Opinion after trial. The Government turned over the Austin Legal Opinion more than a year-and-a-half before trial, reproduced it on September 6, 2019, marked it as a trial exhibit, and directly referenced it during Gleckman's testimony. (Gov't Opp. at 5-6; Tr. 459:22-460:7; 465:18-466:10 (Gleckman testifying that he and Defendant needed an attorney opinion letter to sell the restricted

HECC shares and transfer the proceeds to the Boiler Room).) Further, the Government introduced, through Gleckman, an Austin Legal Group retainer agreement with the subject line "Re: Legal Opinion Letter" that stated: "[t]his is to confirm that you have retained Austin Legal Group to opine on whether or not certain stock certificates are now free trading." (GX 229; GX 229A.)

Accordingly, Defendant was aware of, and free to introduce, the Austin Legal Opinion during trial and the Austin Legal Opinion is not "newly discovered" within the scope of Rule 33.[17]  See United States v. Raniere, No. 18-CR-0204, 2020 WL 4041126, at *3 (E.D.N.Y. July 17, 2020) (denying Rule 33 motion for a new trial based on "newly discovered evidence" where the defendant "was fully aware of these facts prior to and during the trial and cross-examined witnesses on these very topics."); United States v. Bout, 144 F. Supp. 3d 477, 487-88 (S.D.N.Y. 2015) (same); United States v. Kenner, 272 F. Supp. 3d 342, 349 (E.D.N.Y. 2017)

---

[17] Defendant argues that the restricted HECC stock conversion "was done in good faith and in full compliance with SEC requirements" and the Austin Legal Opinion demonstrates that the "conversion was a perfectly legitimate process with no intent to violate the law." (Def. Br. at 1-2, 16.)  Even if Defendant discovered the Austin Legal Opinion after trial, he is "entitled to a new trial only if the court believed that" he would not have been convicted but for the introduction of the Austin Legal Opinion.  Raniere, 2020 WL 4041126, at *4.  The Court is not so convinced.  Defendant makes no argument as to how "technical compliance" with Rule 144 "would provide an effective safe harbor or immunity from prosecution for the manipulation of stock with the intent to defraud investors, which ordinarily would give rise to violations" of Rule 10b-5. United States v. Gordon, 710 F.3d 1124, 1141 (10th Cir. 2013).

(same); <u>United States v. Matos</u>, 781 F. Supp. 273, 279-80 (S.D.N.Y.
1991) ("The defendant is not entitled to a new trial so that he
may employ a different strategy.  Because the proffered testimony
was readily available at the time of trial, there is no newly
discovered evidence within the meaning of Rule 33.") (quoting
<u>United States v. Beasley</u>, 582 F.2d 337, 339 (5th Cir. 1978))).

     D. <u>Defendant's Financial Losses</u>

     Defendant asks the Court to consider the "devastating
economic losses" he suffered and "the worst decline in oil prices
in modern history" and HECC's bankruptcy.  (Def. Br. at 17.)
Defendant cites to <u>United States v. Ferguson</u> where the Second
Circuit affirmed a district court's "conclusion that blind
deference to the jury verdict is unwarranted" because evidence of
pecuniary motive was "unsatisfactory or insufficient" to support
the jury's guilty verdict.  246 F.3d 129, 136-37 (2d Cir. 2001).
In <u>Ferguson</u>, the defendant was convicted of violating 18 U.S.C. §
1959, which requires proof of a pecuniary gain motive, among other
things.  <u>Id.</u>; <u>see</u> 18 U.S.C. § 1959.  There is no equivalent
requirement here and, in any event, pecuniary motive is not
"absolutely lacking" as Defendant suggests.  As the Government
argues, the jury was entitled to believe that Defendant's
significant investment in HECC, despite his significant losses,
served as a motive for the crimes charged.

<u>CONCLUSION</u>

For the reasons stated, Defendant's motion is DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: October __19__, 2020
       Central Islip, New York